[No. 611-41091-1. Division One—Panel 1. January 25, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. CLAUDE GILBERT UTTER, *Appellant*.

*Hohlbein, Vanderhoef, Sawyer & Hartman* and *Wesley G. Hohlbein,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney,* and *Paul M. Acheson, Deputy,* for respondent.

FARRIS, A.C.J.—Claude Gilbert Utter was charged by an information filed January 16, 1969, with the crime of murder in the second degree. He was convicted by a jury of the crime of manslaughter. He appeals from that conviction.

Appellant and the decedent, his son, were living together at the time of the latter's death. The son was seen to enter his father's apartment and shortly after was heard to say, "Dad, don't." Shortly thereafter he was seen stumbling in the hallway of the apartment building where he collapsed, having been stabbed in the chest. He stated, "Dad stabbed me" and died before he could be moved or questioned further.

Mr. Utter entered the armed services in December of 1942 and was honorably discharged in October of 1946. He was a combat infantryman. As a result of his service, he was awarded a 60 per cent disability pension.

Appellant testified that on the date of his son's death he began drinking during the morning hours. He was at the liquor store at 9 a.m. and purchased a quart of Thunderbird wine and a quart of port wine and drank the bottle of port wine with the exception of two drinks. Mr. Utter went for more liquor around noon. At that time he purchased 2 quarts of whiskey and 4 quarts of wine. Upon his return from the liquor store, he and another resident of the apartment "sat around drinking whiskey out of water glasses."

Appellant remembers drinking with his friend and the next thing he remembers was being in jail subsequent to the death of his son. He has no recollection of any intervening events.

Appellant introduced evidence on "conditioned response" during the trial. Conditioned response was defined by Dr. Jarvis, a psychiatrist, as "an act or a pattern of activity occurring so rapidly, so uniformly as to be automatic in response to a certain stimulus." Mr. Utter testified that as a result of his jungle warfare training and experiences in World War II, he had on two occasions in the 1950's reacted violently towards people approaching him unexpectedly from the rear.

The trial court ruled that conditioned response was not a defense in Washington and instructed the jury to disregard all evidence introduced on this subject. Appellant contends that this evidence was not introduced as a defense. In this assertion, appellant is incorrect since if the evidence was received and believed by the jury, the result would be his exculpation. Therefore, it must be considered to be a defense to the crime.

The major issue presented on appeal is whether it was error for the trial court to instruct the jury to disregard the evidence on conditioned response. The trial court held that the defendant was attempting to present a defense of irresistible impulse—a theory of criminal insanity that has consistently been rejected in this state. In so holding, the trial court considered the defense to be one of mental incapacity. This was not so.

There are two components of every crime. One is objective—the actus reus; the other subjective—the mens rea. The actus reus is the culpable act itself, the mens rea is the criminal intent with which one performs the criminal act. However, the mens rea does not encompass the entire mental process of one accused of a crime. There is a certain minimal mental element required in order to establish the actus reus itself. This is the element of volition. *See* Sim, *The Involuntary Actus Reus*, 25 Modern L. Rev. 741 (1962).

■ In the present case, the appellant was charged with second-degree murder and found guilty of manslaughter. The actus reus of both is the same—homicide. Thus, in order to establish either, the fact of homicide must first be established.

■ Appellant contends that his evidence was presented for the purpose of determining whether in fact a homicide had been committed. He argues that his evidence, if believed, establishes that no "act" was committed within the definition of homicide, RCW 9.48.010 (since amended by Laws of 1970, Ex. Ses., ch. 49, § 1, p. 333):

> Homicide is the killing of a human being by the act, procurement or omission of another and is either (1) murder, (2) manslaughter, (3) excusable homicide or (4) justifiable homicide.

What is the meaning of the word "act" as used in this statute?

> It is sometimes said that no crime has been committed unless the harmful result was brought about by a "voluntary act." Analysis of such a statement will disclose, however, that as so used the phrase "voluntary act" means no more than the mere word "act." An act must be a willed movement or the omission of a possible and legally-required performance. This is essential to the *actus reus* rather than to the mens rea. "A spasm is not an act."

(Footnotes omitted.) R. Perkins, Criminal Law 660 (1957).

> [A]n 'act' involves an exercise of the will. It signifies something done voluntarily. It necessarily implies intention. We find these statements abundantly sustained by the text-writers and decisions of our courts.

*Heiman v. Pan American Life Ins. Co.*, 183 La. 1045, 1061, 165 So. 195 (1935). *See also Stokes v. Carlson*, 362 Mo. 93, 240 S.W.2d 132 (1951); *Brown v. Standard Casket Mfg. Co.*, 234 Ala. 512, 175 So. 358 (1937); *Duncan v. Landis*, 106 F. 839 (3d Cir. 1901).

Thus, to invert the statement of Perkins, the word "act" technically means a "voluntary act." *See State v. Peterson*, 73 Wn.2d 303, 438 P.2d 183 (1968).

■ It is the appellant's contention that any of the alleged "acts" he committed were not those which involved mental processes, but rather were learned physical reactions to external stimuli which operated automatically on his autonomic nervous system. Although the theory sought to be presented by the appellant is similar to one of mental incapacity, it is nevertheless distinct from that concept.

automatistic acts are concomitants of mental disturbance of some kind. The mental disturbance may or may not be sufficient to establish legal insanity. Indeed, it would generally appear to be true that where the defendant's acts are automatistic in character he cannot be said to have capacity to know their nature, and where he lacks capacity to know the nature of his acts, those acts must be said to be automatistic. Yet the automatistic acts may not be the result of a mental disease [Mr. Utter claims here that they are the result of military training] and hence not sufficient to constitute legal insanity. In any event, it is important to emphasize that *whether or not* the mental disturbance associated with the acts of automatism is equivalent to legal insanity, it is universally recognized that evidence of this character goes toward the exculpation of the accused, rather than mitigation to a lesser offense. And the exculpation is not of the qualified character attached to a verdict of not guilty on grounds of insanity. It is complete.

M. Paulsen and S. Kadish, Criminal Law and Its Processes. 347 (1962).

Appellant contends that a person in an automatistic or unconscious state is incapable of committing a culpable act —in this case, a homicidal act.

The question is not one of mental incapacity. "Criminal responsibility must be judged at the level of the conscious." *State v. Sikora*, 44 N.J. 453, 470, 210 A.2d 193 (1965).

There is authority to support the proposition of the appellant.

Where, at the time of the killing, the slayer was clearly unconscious thereof, such unconsciousness will constitute a defense, as in the case of a homicide committed by one in a state of somnambulism, or while delirious from disease.

(Footnotes omitted.) O. Warren and B. Bilas, 1 Warren on Homicide § 61 (perm. ed. 1938).

> If a person is in fact unconscious at the time he commits an act which would otherwise be criminal, he is not responsible therefor.
>
> The absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability.

(Footnotes omitted.) R. Anderson, 1 Wharton's Criminal Law and Procedure § 50 (1957). A number of cases support these statements. *State v. Mercer,* 275 N.C. 108, 165 S.E.2d 328 (1969); *People v. Wilson,* 66 Cal. 2d 749, 427 P.2d 820, 59 Cal. Rptr. 156 (1967); *People v. Anderson,* 63 Cal. 2d 351, 406 P.2d 43, 46 Cal. Rptr. 763 (1965); *Watkins v. Commonwealth,* 378 S.W.2d 614 (Ky. 1964); *Carter v. State,* 376 P.2d 351 (Okla. Crim. 1962); *People v. Gorshen,* 51 Cal. 2d 716, 336 P.2d 492 (1959); *Corder v. Commonwealth,* 278 S.W.2d 77 (Ky. 1955); *People v. Baker,* 42 Cal. 2d 550, 268 P.2d 705 (1954); *Smith v. Commonwealth,* 268 S.W.2d 937 (Ky. 1954); *Fain v. Commonwealth,* 78 Ky. 183, 39 Am. Rep. 213 (1879). *See also,* 22 C.J.S. *Criminal Law* § 55 (1961); 21 Am. Jur. 2d *Criminal Law* § 29 (1965).

In *State v. Strasburg,* 60 Wash. 106, 110 P. 1020 (1910) the Washington Supreme Court considered the constitutionality of a statute which withdrew the defense of insanity from those defenses that could be raised in this state. In holding the statute unconstitutional, the court made an extensive review of basic tenets of criminal law and noted in part as follows:

> "All the several pleas and excuses which protect the committer of a forbidden act from the punishment which is otherwise annexed thereto may be reduced to this single consideration, the want or defect of *will.* An involuntary act, as it has no claim to merit, so neither can it induce any guilt; the concurrence of the will, when it has its choice either to do or to avoid the fact in question, being the only thing that renders human actions either praiseworthy or culpable.
> ". . .

"Without the consent of the *will*, human actions cannot be considered as culpable; nor where there is no will to commit an offense, is there any just reason why a party should incur the penalties of a law made for the punishment of crimes and offenses."

*State v. Strasburg, supra* at 113.

■ An "act" committed while one is unconscious is in reality no act at all. It is merely a physical event or occurrence for which there can be no criminal liability. However, unconsciousness does not, in all cases, provide a defense to a crime. When the state of unconsciousness is voluntarily induced through the use and consumption of alcohol or drugs, then that state of unconsciousness does not attain the stature of a complete defense. Thus, in a case such as the present one where there is evidence that the accused has consumed alcohol or drugs, the trial court should give a cautionary instruction with respect to voluntarily induced unconsciousness.

The issue of whether or not the appellant was in an unconscious or automatistic state at the time he allegedly committed the criminal acts charged is a question of fact. Appellant's theory of the case should have been presented to the jury if there was substantial evidence in the record to support it.

■■ It is the function and province of the jury to weigh evidence and determine credibility of witnesses and decide disputed questions of fact. *State v. Dietrich*, 75 Wn.2d 676, 453 P.2d 654 (1969). However, a court should not submit to the jury an issue of fact unless there is substantial evidence in the record to support it. *State v. Brooks*, 73 Wn.2d 653, 440 P.2d 199 (1968); *State v. Collins*, 66 Wn.2d 71, 400 P.2d 793 (1965).

We find that the evidence presented was insufficient to present the issue of defendant's unconscious or automatistic state at the time of the act to the jury. There is no evidence, circumstantial or otherwise from which the jury could determine or reasonably infer what happened in the room at the time of the stabbing; the jury could only speculate on the existence of the triggering stimulus.

Appellant contends that it was error for the trial court to instruct the jury on manslaughter. This assignment of error is founded upon the allegation that the record contains no evidence to support such an instruction.

■ Manslaughter includes all homicides not falling within the definitions of murder in the first or second degree, or excusable or justifiable homicide. *State v. Hedges,* 8 Wn.2d 652, 113 P.2d 530 (1941). The trial court ruled that the homicide was neither justifiable nor excusable. Evidence was introduced regarding appellant's drinking habits, the amount he drank that day, and the fact that he was an alcoholic. Evidence of voluntary intoxication can be presented as a defense to a crime where intent is an element. RCW 9.01.114; *State v. Byers,* 136 Wash. 620, 241 P. 9 (1925). Furthermore, criminal intent is not an element of manslaughter. *State v. Brubaker,* 62 Wn.2d 964, 385 P.2d 318 (1963); *State v. Hopkins,* 147 Wash. 198, 265 P. 481, 59 A.L.R. 688 (1928). The evidence regarding appellant's drinking was sufficient to negative the criminal intent required for a conviction of second-degree murder and necessitated the giving of the manslaughter instruction. It was therefore proper for the trial court to so instruct the jury.

■ The trial court gave instruction 9:

The court instructs the jury that the law presumes that every man intends the natural and probable consequences of his own acts.

Appellant contends that this was a comment upon the evidence and denied him his right to a trial by jury. We do not agree. "Voluntary" is included in the definition of the word "act."[1] The insertion of the word "voluntary" might improve the instruction but it is not constitutionally required. Under our determination of the issues it was not error to submit the instruction.[2]

Affirmed.

JAMES and SWANSON, JJ., concur.

---

[1]*See* R. Perkins, Criminal Law 660 (1957).

[2]But *see State v. Peterson,* 73 Wn.2d 303, 438 P.2d 183 (1968).